173   525
41SC⁴133

Lewis Albertson, Appellant, *v.* Robert Laughlin, Charles A. McManus and William King, late doing business as Laughlin & McManus; John S. Hopkins, Receiver of said Firm of Laughlin & McManus, Robert Laughlin, Individually, and David H. Lane.

*Contract—Gambling contract—Payment—Equity.*

A court of equity will not lend its aid in a gambling transaction either to the winner to compel payment of his unpaid gains, or to the loser who has paid his losses, to enable him to recover them back; whether the loser pays his losses in cash or in negotiable securities.

Where a negotiable promissory note was delivered to a broker to secure him against loss in stock transactions, and actually negotiated by the broker for the payment of the very losses for which it was pledged, and the note is held by an innocent purchaser without notice, a court of equity will not compel the return of the note because it was given to the broker for a gambling debt.

*Promissory notes—Negotiability.*

The negotiability of a promissory note in ordinary form is not affected by the addition of the words " the payment of this note is secured by deed of trust of even date herewith on real estate in Cook county, Illinois."

The negotiable character of a promissory note is not affected by the fact that it is made payable by its terms on or before a future day therein named.

Argued Jan. 16, 1896.    Appeal, No. 155, July T., 1895, by plaintiff, from decree of C. P. No. 3, Phila. County, June T., 1893, No. 1153, dismissing bill in equity.    Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL JJ.    Affirmed.

Bill in equity to compel the surrender of two promissory notes.

The plaintiff in his bill averred that prior to February 14, 1893, he had been engaged in stock gambling through and with Laughlin and McManus; that on that day he had delivered to defendant, Laughlin, a certain note dated Chicago, January 1, 1890, by Oscar S. Bass, to his order, promising to pay, on or before nine years thereafter, the sum of $29,134.92 with interest yearly, which was secured by a certain deed of trust of real

estate in Cook county, Illinois; that said note had been deliv-
ered as security for payment of the sum of $10,000 loaned to
him by Laughlin for the purpose of stock gambling; that at the
same time Laughlin & McManus were carrying stocks for him
in gambling operations, which subsequently they sold, causing
an apparent balance of $20,393.19 against him in their accounts;
and that a receiver had been afterwards appointed for said firm.
He further averred he had been informed that David H. Lane,
who, without consideration and illegally, had come into posses-
sion of said Bass note, was holding the same as collateral secur-
ity.  He prayed an injunction against the negotiation of said
note, and a decree that the same should be delivered up to
him, together with the note for $10,000 which he had given
Laughlin.

Laughlin and McManus filed separate answers, in which they
admitted the delivery of the note; denied that the operations
they had conducted for the complainant were in the nature of
stock gambling; averred that their transactions were legitimate
dealings in stocks to be delivered.  They also averred that in
addition to the $10,000 due Laughlin, a balance of $20,393.19
was due to them by the complainant upon stock operations;
that they were entitled to hold the note as collateral to secure
this balance; and that McManus had delivered the Bass note to
Lane for the sum of $29,134.92, "paid to them in cash by said
David H. Lane, who had no knowledge of the claim set forth in
the bill filed."

Lane filed an answer, in which he averred ignorance of all
the facts set forth by complainant in his bill concerning the
nature of his transactions with Laughlin & McManus, and of
any of the facts alleged to have occurred antecedently to the
delivery to him of said Bass note.  He set up his purchase
from the firm of said note for the sum of $29,134.92, which he
averred he had paid to them in cash.

The Bass note above referred to was as follows:

$29,134.92.                    CHICAGO, January 1, 1890.

On or before three years after date, for value received, I
promise to pay to the order of. Lewis Albertson the principal
sum of twenty-nine thousand one hundred and thirty-four &
$\frac{92}{100}$ Dollars, with interest thereon at the rate of six per cent.

per annum, payable yearly, to wit: on the first day of January in each year, until said principal sum is fully paid. Both principal and interest are payable at the First National Bank of Chicago.

The several installments of interest aforesaid, for said period are further evidenced by three interest notes or coupons of even date herewith.

The payment of this Note is secured by Deed of Trust of even date herewith, on real estate in Cook County, Illinois.

OSCAR S. BASS.

The case was referred to Charles Biddle, Esq., as master, who reported in favor of the respondents both in the matter of the bona fides of Lane's purchase and the character of the operations between appellant and the firm. He reported a decree dismissing the bill. Numerous exceptions were filed in the court below which, after argument, were dismissed. A decree dismissing the bill was duly entered.

Other facts appear by the opinion of the Supreme Court.

*Error assigned,* among others, was decree dismissing bill.

*John G. Johnson, William H. Shoemaker* and *William S. Stenger* with him, for appellant.—The delivery of the Bass note to Lane was in fraud of the rights of the appellant. Lane was not a bona fide holder for the value of the Bass note.

The balance claimed by Laughlin & McManus to be due to them, for which they claimed to hold, as security, the Bass note, was not due and payable, because it resulted solely from gambling transactions: Gaw v. Bennett, 153 Pa. 247; Mohr v. Miesen, 49 N. W. 863; Rumsey v. Berry, 65 Me. 570; North v. Phillips, 89 Pa. 250; Brau's App., 55 Pa. 294; Dickson's Ex'r v. Thomas, 97 Pa. 278.

*Thomas R. Elcock, Bernard Gilpin* with him, for appellees.— The Bass note is a negotiable note: Ernest v. Steckman, 74 Pa. 13; Bank v. Crowell, 148 Pa. 284; Woods v. North, 84 Pa. 407; Johnston v. Speer, 92 Pa. 227; Bank v. Piolett, 126 Pa. 195; Bank v. McCord, 139 Pa. 52; 16 Am. & Eng. Ency. of Law, 479; Munn v. McDonald, 10 Watts, 270; Shires v. Com.,

120 Pa. 368; Zimmerman v. Anderson, 67 Pa. 421; Zimmerman v. Rote, 75 Pa. 188; McIntyre v. Steel, 1 W. N. C. 494; Overton v. Tyler, 3 Pa. 346; Sweeny v. Thickstun, 77 Pa. 131; Woods v. North, 84 Pa. 407.

Because a number of transactions are speculative in their character, they are not necessarily gambling contracts: Smith v. Bouvier, 70 Pa. 325; Griffiths v. Sears, 112 Pa. 523; Maxton v. Gheen, 75 Pa. 166; Stewart v. Parnell, 147 Pa. 523; Peters v. Grim, 149 Pa. 163.

" A general custom that a broker may pledge his customer's stock for the purpose of raising money to carry it, is valid," and " when the market value of stock so pledged falls below a price that will reimburse the brokers for all expenses, a custom of brokers to sell out the customer's stock without notice and hold the latter liable for loss, is valid:" Price v. Gover, 40 Md. 102; Donald v. Suckling, L. R. 1 Q. B. 385; Langlon v. Waite, L. R. 6 Eq. 165; France v. Clark, L. R. 22 Ch. D. 830; Vanhorn v. Gilbough, 10 W. N. C. 347; Canfield v. Minneapolis, etc., 14 Fed. Rep. 801; Goss v. Emerson, 23 N. H. 38; Jarvis v. Rogers, 15 Mass. 105; Levy v. Loeb, 85 N. Y. 365; Stewart v. Drake, 46 N. Y. 449; Frost v. Clarkson, 7 Cowen, 24; Allen v. Dykers, 3 Hill, N. Y. 393; Hubbell v. Drexel, 11 Fed. Rep. 115.

If, for the sake of argument, we grant that the transactions between Albertson and Laughlin & McManus were gambling transactions a court of equity will not give him any relief. It will not grant relief against the collection of a mortgage or judgment given to cover past and future gambling transactions: Smith v. Kammerer, 152 Pa. 98; Hopkins v. O'Kane, 169 Pa. 478.

OPINION BY MR. JUSTICE WILLIAMS, February 10, 1896:

The important facts in this case may be very briefly stated. The defendants Laughlin and McManus were stock brokers. Albertson, the plaintiff, had been for some years one of their customers. In February, 1893, he borrowed $10,000 from Laughlin for which he gave his own note. About the same time he turned over to Laughlin a note for $29,134.92, which was known as the " Bass note," as collateral security for the payment of his own note and for the payment of " any losses that might be be-

tween the said firm of Laughlin and McManus and said Lewis Albertson " in their stock transactions. Within a few days after this was done a balance on account of losses appeared on the books of the firm against Albertson of about $20,000. On the 2d day of March, 1893, the firm with the consent of Laughlin transferred the Bass note to David H. Lane for the sum of $29,000. The master has found that Lane was a purchaser bona fide and without notice of any equity of Albertson in the note. Laughlin and McManus made an assignment for the benefit of creditors within a few hours after the transfer of the Bass note to Lane. On the 4th day of the following August, this bill was filed against Laughlin and McManus, against Hopkins the receiver, and against Lane the holder of the Bass note. It alleges that the $10,000 borrowed from Laughlin was obtained, with the knowledge of the lender, for use in stock gambling operations; and that the balance of $20,000 appearing against him on the books of the firm was for losses incurred in stock gambling done by him through them. These allegations, with another asserting notice to Lane of the title of the plaintiff to the Bass note, make the basis on which is grounded a prayer for a decree directing that the plaintiff's own note for the $10,000 borrowed from Laughlin, and the Bass note, be delivered up to him. The delivery of the note for $10,000 has not been insisted on in the argument for the appellant made in this court, but the right of the plaintiff to the Bass note both as against Laughlin and McManus and against Lane has been urged with great earnestness. We are unable to see, however, how we can interfere with the transactions between the plaintiff and his broker which they have already closed. If we assume the truth of every averment in the bill stating the nature of the transactions in stocks in which the losses were sustained no ground for the interference of a chancellor is disclosed. It does not matter so far as the legal effect of payment is concerned whether the loser in a gambling transaction pays his losses in cash or in negotiable securities. He cannot recover what he has voluntarily paid in either case. The winner could not recover from him by an action at law if he refused to pay, nor could he recover back from the winner the money or the security paid by him to cover his losses. The law will leave both parties just where it finds them, and will afford its help to

neither.    A fortiori will a court of conscience turn away from the illegal transaction and deny its aid either to the winner to compel payment of his unpaid gains, or to the loser who has paid his losses to enable him to recover them back.    In this case it appears by the proofs and is found as a fact by the master, that the plaintiff provided for the payment of his losses, to the extent of the balance due upon the Bass note over his own note to Laughlin, by an agreement in writing delivered at the time the Bass note was delivered by him to Laughlin.

This security so delivered was negotiable, and has been actually negotiated by the firm for the payment of the very losses for which it was pledged to them.    What we are asked to do is to compel its return because it was held by the firm for a gambling debt.    This we cannot do.    Having provided for the payment of his losses, and the note put in the hands of the firm for that purpose having been negotiated, as the court below have held, to one who bought for full value and without notice, the plaintiff is in the position of any other loser who has paid his losses.    We agree with the court below in holding the Bass note to be negotiable, and we have been shown no sufficient reason for overruling the finding of the master, concurred in by the learned judge of the court below, that Lane is a purchaser bona fide and without notice.    In this view of the case it becomes unnecessary to enter upon an examination of the transactions between Albertson and his brokers.    The master thinks they were not of a gambling character but were purchases and sales for actual delivery.

Whether the evidence showing the purchase and sale of over a half million dollars worth of stock in a few years, not one share of which was delivered to the plaintiff or actually paid for by him, but all of which was settled for on margins and the profit or loss alone accounted for, justifies his finding is a question that we shall not enter upon.    It is not necessary for the decision of this case.    Give the plaintiff the full benefit of his position on this question and treat the stock transactions as all illegal, a mere wager on the course of the market, and we can see no way in which a chancellor can help him to regain what he has lost.    The case of Peters et al. v. Grim, 149 Pa. 163, and Gaw v. Bennett, 153 Pa. 247, hold that a purchase and sale on margin is not necessarily illegal, but they both adhere to the

rule that a contract that appears to be an illegal and gambling contract is one with which the courts will not interfere to assist either the unpaid winner or the loser who has paid his losses. Leaving the plaintiff therefore to stand on his own position, we can afford him no relief.

The decree is affirmed; the costs to be paid by the appellant.